PRESENT:  Goodwyn, Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Russell, S.J.

NATHANIEL DENNIS

v.  Record No. 171599

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE WILLIAM C. MIMS
February 21, 2019

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider under what circumstances the Court of Appeals abuses its discretion by dismissing a petition for a writ of actual innocence based on nonbiological evidence without referring the matter to a circuit court for an evidentiary hearing.

I.  BACKGROUND AND MATERIAL PROCEEDINGS BELOW

This case arises from the Court of Appeals' dismissal of Nathaniel Dennis' petition for a writ of actual innocence based on nonbiological evidence.  As discussed below, the petition and its supporting evidence raised substantial factual questions, but the Court of Appeals resolved those questions on the record without referring any issues to a circuit court for an evidentiary hearing.

A.  The Underlying Offense

On the night of October 8, 1997, Lynwood Harrison was working alone in his office located in the "Signs building" of the Daily Press newspaper facility in Newport News, Virginia. This building was kept locked at night, except for a side door near Harrison's office, which he unlocked for contractors who arrived to transport newspapers from the facility to retailers.

At about 11:45 p.m., the cleaning crew, which Dennis supervised, began cleaning the building.  Harrison did not see or interact with the cleaning crew, but he heard the "normal sound" of their cleaning cart moving across the floor.  After twenty or thirty minutes, Harrison heard the cleaning crew leave the building and lock the side door behind them.

A few minutes before 12:30 a.m., Harrison unlocked the side door to allow contractors to enter. Shortly thereafter, Harrison noticed someone standing at "the doorway coming from the front part of the building." Harrison testified that he was "certain" the intruder did not enter through the unlocked side door because that door "makes a noise" and the intruder did not come from that direction.

Harrison observed that the intruder was advancing toward him holding a metal pipe in the air. He tried to retreat, but the intruder hit him in the face with the pipe. The intruder struck him in the arm as they "wrestled out into the hallway," where he knocked out one of Harrison's teeth. At that point, Harrison asked the intruder "why [he] was doing this?" The intruder responded by drawing a gun and saying, "If you resist any more, I will kill you." He then forced Harrison to the front of the building, where he instructed him to lie down. Even though Harrison complied, the intruder struck him again, then stated, "[s]tay here and you might just live through this" before walking towards Harrison's office. Once the intruder walked away, Harrison saw "the lights dim in the hallway" and "heard a couple of doors opening and closing."

The intruder returned four or five minutes later. He retrieved a key from his pocket, used it to unlock a set of double doors, and placed the pipe outside the door. He asked Harrison where the keys to the truck parked outside were located, and Harrison replied that they were on the desk in his office. The intruder quickly went to and from Harrison's office, then grabbed Harrison off the floor and put him against a counter with the gun pointed at him.

While this was happening, someone opened the side door and asked, "Is anyone here?" Harrison, being held at gunpoint, did not respond. The person who called out was Jerry Oxenburg, one of the expected newspaper contractors, who arrived at approximately 12:45 a.m. to pick up newspapers. He had noticed that the Signs building lights were out, which he found

2

unusual. When he stepped in through the side door, he observed that Harrison's office was in disarray and noticed a figure ducking out of sight in the direction of the front door. Concerned that "something wasn't right," Oxenburg left the building to retrieve a gun from his car.

The moment Oxenburg left to get his gun, the intruder shot Harrison three times, and then walked away towards Harrison's office and the rear of the building. Harrison managed to escape through the double doors the intruder had unlocked. Once outside, Harrison noticed the pipe laying by the door then continued to the side of the building calling out for Oxenburg, saying "Jerry, where are you? I've been shot." After reentering the building and seeing a "tall person" pointing a gun at him, Oxenburg retreated outside where he found Harrison "crawling on the ground." Oxenburg called the police around 12:57 a.m. Harrison described his assailant as a "black male, tall, thin build," and Oxenburg later reported to police that the figure he saw was a black male, about six feet, one inch in height, wearing dark clothes and wearing a rag of some sort on his head.

The police arrived at the Daily Press at 1:01 a.m. and found Harrison's office "ransacked." The next day, a Daily Press employee reported to police that "there may have been $390 in Mr. Harrison's office at the time of the attack," and at that time, "the money [could] not be located." Harrison later testified that on the night of the attack, he was counting around $400 in his office and did not know what happened to it. He also stated that a bag of coins amounting to roughly $1200 was in his office that night.

B. Investigation

Detective Eugene Price investigated the attack with other officers. Price testified that "it was brought to [his] attention" during the initial hours of investigation that Dennis matched the description of Harrison's assailant. He spoke with Dennis while investigators were processing

3

the crime scene. Dennis stated that he had left the Signs building around 12:30 a.m. Once investigators finished processing the scene, they turned the building over to the Daily Press midnight custodial crew—which included Dennis—for clean-up.

The day after the attack, Price went to Riverside Hospital to interview Harrison. He asked Harrison if he knew anyone named Nathaniel Dennis, and Harrison replied that he did not. After Price left the hospital, Harrison realized that he had seen the name Nathaniel Dennis on Bernadette Harris' caller ID once when he was visiting her. Harrison had dated Harris, a fellow Daily Press employee, "off and on" in 1992, and they remained friends even though they were no longer dating at the time of the attack. The reason Harrison had observed Dennis' name on Harris' caller ID is that Harris had also dated Dennis between August 1996 and May 1997.

When Harris came to visit Harrison at the hospital after the attack, he asked her about Dennis. She said that Dennis worked as a night supervisor in the Daily Press housekeeping department. Harrison then asked if Dennis was "tall, dark[-]skinned, [and] slim," and she replied that Dennis had those features. Harrison then sought a photograph of Dennis from the police. Price returned to the hospital a few days later with a photo spread of six people who matched the assailant's description "as close as possible." After studying the array for roughly thirty to forty-five seconds, Harrison identified Dennis as his attacker. Harrison stated that he had "no doubt" that the picture he selected depicted "the person that attacked [him] that night." Price then obtained warrants for Dennis' arrest.

C. Trial

Dennis was charged with attempted murder, malicious wounding, and use or display of a firearm during the commission of a felony. He pleaded not guilty to all charges and was tried by a jury. The Commonwealth first called Harrison, who described the attack and identified Dennis

4

as his assailant.  On cross-examination, Harrison testified that he had never seen Dennis before the attack.  Defense counsel, however, impeached Harrison with a statement he wrote to Price while in the hospital stating that he had seen Dennis as he came in the Signs building during the two months before the attack.  Harrison also testified that his attacker had an unusual accent.  The record does not reveal what accent Dennis might have.[1]

The Commonwealth also produced a number of witnesses whose testimony suggested a motive for Dennis' attack on Harrison.  Florence McStay, who worked in the security office of the Daily Press, testified that Dennis twice inquired about Harrison and said that Harrison is "an arrogant black man. . . .  He thinks he's better than anybody else.  Instead of . . . downing his fellow black man he should be . . . trying to help him."  Norman Taft, another person who worked at the Daily Press, testified that Dennis asked him if he knew Harrison.  Edward Swinton, who worked with Dennis, similarly testified that Dennis asked him if he knew Harrison and also inquired where Harrison lived.  When Swinton asked Dennis why he wanted to know where Harrison lived, Dennis replied that Harrison had something he wanted.  Finally, Christopher Sydnor, who worked at the plant, testified that Dennis told him that "a black man in [Harrison's] position, he should watch how he treats other black men who aren't in the same position he's in."

Patricia Farmer, a member of the housekeeping department night crew supervised by Dennis, testified that the crew began cleaning the Signs building between 11:30 p.m. and 12:00 a.m. and finished thirty to forty-five minutes later.  She stated that after the crew left, Dennis locked the door and then gave her the key.  Farmer remembered returning the key to Dennis later

---

[1] The record also does not reveal what accent alleged perpetrator Abdul Al-Musawwir might have.

5

that night for him to check the key back in, but she could not remember when. After cleaning the Signs building, the crew proceeded to the "production building." Dennis left the crew members while they were inside the production building. Farmer stated she did not know where he went during that time. She testified that, once he returned, Dennis told the crew to stay together because something had happened. Farmer could not recall what time Dennis returned to the crew, but indicated that he was acting "fine" at that time.

Dennis testified in his own defense at trial and denied attacking Harrison. He testified that after finishing in the Signs building, the cleaning crew went to the production building's third floor. He worked with the other crew members there for a while, then left to purchase a soda for Bonita Barnes, who worked on the first floor. Dennis stated that he purchased a soda on the second floor, and then gave it to her in the first-floor production room where she was working. Barnes testified that Dennis gave her the drink while she took a break at around 12:40 a.m. She said that she saw Dennis "walking around" a "variety" of other times that night and that she "usually" sees Dennis walking around during her shift from 11:00 p.m. to 7:00 a.m. Barnes acknowledged on cross-examination that she was not certain whether Dennis got her the drink on the night of the attack or on another night, but explained that "[i]t was pointed [out] to me that it was that same night." She did not say who pointed it out to her. Nevertheless, Barnes confirmed on redirect examination that she saw Dennis the night of the shooting.

Dennis testified that, after giving Barnes the drink, he went to the spinning room, which is adjacent to the production room. He explained that if any "paper [was] left," he had to "spin" it there as one of his job duties. He stayed in the spinning room for "approximately 15 minutes," and estimated that it was about 12:55 a.m. when he left the spinning room for the production building's second floor to check on whether a piece of cleaning equipment was there. On his

6

way out of the production building, he saw Barney Payne standing by a window. Payne told Dennis that he had "seen some car go by." Payne testified that while he was working in the press room on the night of the attack, he saw a car coming from the direction of the Signs building at an unusual rate of speed. He said the car "had to be going 25 miles an hour, because [he] thought, [s]omebody is crazy to be driving like that through the parking lot."

After speaking with Payne—at about 1:00 a.m. by his estimate—Dennis walked behind the production building toward the security office, where the security guard, Celestine Pinckney-Lloyd, asked him to "mind the camera" because there had "been a shooting." He testified that he stayed and watched the cameras for fifteen to thirty minutes. Pinckney-Lloyd testified that Dennis walked into the security office and started talking to her at about 1:20 a.m. She stated that although she would not have ordinarily asked a cleaning crew supervisor to do so, she asked Dennis to watch the cameras because she "needed to go out to the scene where the injury was." She returned to the security office about fifteen minutes later.

Pinckney-Lloyd also testified that keys to the Signs building had been reported missing before the night of the attack. In an interview with Detective Price, she explained that the security office maintains a log showing who checks out and returns keys. She stated that on the night of the attack, Dennis turned in a key to the Signs building at approximately 12:05 a.m., and said he was going for coffee. At trial, however, Pinckney-Lloyd did not mention seeing Dennis at this time or that he gave her a key to the Signs building.

The jury found Dennis guilty of all charges. The circuit court sentenced Dennis to life imprisonment for malicious wounding, an additional ten and three years' imprisonment respectively for attempted murder and display of a firearm in the commission of a felony, and a total of $200,000 in fines. The Court of Appeals affirmed his convictions on direct appeal.

7

*Dennis v. Commonwealth*, Record No. 1285-98-1, 1999 WL 1133668, at *1 (Oct. 19, 1999).

This Court refused his petition for appeal.

D.  Petition for Actual Innocence

In May 2017, Dennis filed a petition for a writ of actual innocence based on nonbiological evidence in the Court of Appeals.  The petition asserted that newly discovered evidence established that another Daily Press employee named Abdul Al-Musawwir, "who looks strikingly like Dennis," was actually responsible for the attack on Harrison.  The evidence fell into three categories:  (1) affidavits from Al-Musawwir's then-girlfriend, Koneta Walker, averring that he told her he had attacked someone before she picked him up from the Daily Press in the early morning hours of October 9, 1997, as well as affidavits from other witnesses supporting Walker's account; (2) five inmate affidavits averring that Al-Musawwir confessed to them that he shot Harrison; and (3) related evidence from a former Newport News police detective who reopened Dennis' case.[2]

Al-Musawwir, whose former name is William Grant, has an extensive criminal history, including burglary, shooting into an occupied dwelling, and assault.  He was convicted of two counts of first-degree murder and abduction in 1972, for which he received two life sentences.  He served twenty-two years before being released on parole.  In April 1998, he shot Walker in the back of the head at point-blank range.  He told police that he "accidentally shot her" while trying to place a handgun under the passenger seat of the car they were in.  She, however, explained that after she told him that she wanted to go home, he produced a revolver, "brought it

---

[2] Although Dennis did not designate most of the information in the detective's statements as "newly discovered evidence" in his petition, this Court may consider the newly discovered evidence along with "all of the other evidence in the current record."  Code § 19.2-327.11.

up to her head[,] and fired once." A jury convicted him of aggravated malicious wounding and sentenced him to life in prison, a sentence he is presently serving.

Al-Musawwir worked as a Daily Press delivery driver in October 1997. Dennis maintains that this employment combined with his appearance shows that Dennis' conviction for the assault on Harrison is a case of mistaken identity. Police records created following Al-Musawwir's 1998 arrest for shooting Walker describe him as a thin black male, six feet tall, and weighing 185 pounds. Dennis argues that Al-Musawwir's appearance is consistent with Harrison's description of the assailant as "very tall, over six feet, probably six feet, two, dark skin."

### 1. Walker's Account

Dennis submitted two affidavits from Walker. In the first affidavit, dated April 17, 2010, Walker stated that Al-Musawwir was her boyfriend for about five years, until April 1998, when he shot her in the head. Walker stated that on "October 13, 1997"—not October 9, 1997, when the attack indisputably occurred—Al-Musawwir called her "from the Daily Press, telling [her that he] needed to be picked up before his normal quitting time." Walker continued:

> When I arrived at the back of the Signs/Muzak Building, Al-Musawwir was anxious and sweating profusely. Al-Musawwir's knuckles were bloody and scraped up as though he had been in a fight. Al-Musawwir told me that he had just "f[*****]-up some n[*****]." And Al-Musawwir was carrying a bag of coins, which he said were from a vending machine he had broken into.

"[S]hortly after this," Al-Musawwir told Walker "he had stolen some keys from the Daily Press building." Walker further stated that during the time they dated, Al-Musawwir "owned at least five handguns." The affidavit concludes with Walker stating that Al-Musawwir shot her "when [he] found out I was going to break up with him."

Walker's second affidavit, dated September 28, 2015, is almost identical to the first, including the mistaken inclusion of October 13, 1997 as the date of the incident. The only differences between the affidavits are that Walker stated that Al-Musawwir was "carrying a bag of money" rather than a "bag of coins," some substitutions of pronouns for Al-Musawwir's name, the inclusion of an "[e]xecuted on" blank, and a different witness.[3]

To support Walker's affidavits, Dennis submitted a declaration from Don Stoop, a staff investigator with the Mid-Atlantic Innocence Project who interviewed Walker by telephone in September 2017. According to Stoop, Walker could not "recall the exact date on which the attack occurred." Nonetheless, Walker "maintained her position that Abdul Hasib Al-Musawwir committed the attack at the Newport News Daily Press in October 1997." Stoop further stated that Walker "was certain that the events she described occurred on the night of the attack, which had been highly publicized." Walker clarified to Stoop that while both of her affidavits were accurate, she "specifically recalled" seeing coins in Al-Musawwir's bag on the night of the attack. Stoop also explained that Walker did not notify law enforcement earlier because "she feared Al-Musawwir would find a way to kill her if she said anything about what he had done." However, Walker stated that she "did confide in one friend named Ellen Speller just after the Daily Press attack."

---

[3] A 1999 news article included in the record observes that Walker "suffered permanent brain damage" including "memory loss and the ability to perform everyday tasks" as a result of the shooting. The Commonwealth also points out that, at Al-Musawwir's trial, she never suggested as a motive for the shooting that she had any damaging information about his commission of another offense. Instead, she testified that he shot her because he was angry. She also indicated that that they had broken up approximately a year and a half before the shooting, meaning that she was not his girlfriend when he shot her. Finally, the Commonwealth notes that in both affidavits, filed five years apart, Walker lists her age as 53.

Dennis therefore also submitted an affidavit from Ellen Speller. In it, Speller averred that "[i]n late 1997, Koneta told me first in person, and then several additional times by phone, about a crime her then-boyfriend, Abdul Hasib Al-Musawwir, had committed at the Newport News Daily Press." Speller recalled Walker telling her that Al-Musawwir "had killed somebody or done something to a body." Speller indicated that she "believe[d]" Walker confided in her "within a matter of days of the Daily Press incident," and "certainly well before Al-Musawwir shot Koneta."

2. The Five Inmate Affidavits

In addition to evidence relating to Walker's account, Dennis also submitted affidavits from five inmates who claimed that Al-Musawwir confessed to attacking Harrison at the Daily Press. In an affidavit signed on June 4, 2002, Andre Lamont Terry—who was then incarcerated—stated that he met Al-Musawwir at Hampton Roads Regional Jail in 1997, where they were incarcerated in the same cell block for about five months. According to Terry, Al-Musawwir confessed to beating Harrison with a pipe and shooting him as part of a robbery. Al-Musawwir told Terry that "another person named Nathaniel Dennis with similar features to his had been charged with the crime." Al-Musawwir also indicated he "shot his girlfriend because she was aware of his crime at the Daily Press and he was afraid she would tell the authorities." Terry "is now believed to be deceased."

In a declaration signed on March 3, 2010, Andre Wiggins stated that he was incarcerated with Al-Musawwir for part of 1998. Wiggins recalled that while playing dominos with Andre Terry and George Holley, Al-Musawwir "came up and joined our conversation." During the conversation,

> Al-Musawwir said he actually had attacked Lynwood Harrison at
> the Daily Press, even though Nathaniel Dennis had been charged

11

with the crime. Al-Musawwir said Al-Musawwir had beaten Harrison with a pipe, then shot Harrison in the head. Al-Musawwir seemed proud of this.[4]

Wiggins also stated that Al-Musawwir mentioned that he worked at the Daily Press and that "change was kept in Harrison's office." Wiggins was not incarcerated at the time he signed the affidavit.

George Holley executed an affidavit on March 10, 2010 averring that he had been incarcerated with both Dennis and Al-Musawwir. He observed that the two men "look a lot alike, like brothers, so it made sense that one could be mistaken for the other." Al-Musawwir told Holley he was working at the Daily Press as a janitor in late 1997 or early 1998. He and his girlfriend were using crack cocaine at the time, but ran out of money. Because of his work at the Daily Press, Al-Musawwir knew that there occasionally was money in Harrison's office. With that knowledge, Al-Musawwir told Holley, he took a pipe from a machine, snuck toward Harrison's office, attacked Harrison with the pipe, and then shot him. Al-Musawwir told Holley that he "set up the crime scene so that it would look like a crime of passion, not a robbery." Al-Musawwir also told Holley that his girlfriend drove him away from the scene, and that he "eventually shot [her] because [he] was worried that she would tell someone what [he] had done." Holley was not incarcerated at the time he signed the affidavit.

In an affidavit dated November 22, 2011, Harry Cutchin stated that after he was transferred to Keen Mountain Correctional Center in June 2003, Al-Musawwir approached him because he heard Cutchin had "layman legal experience." The pair developed a rapport and "talked daily" over the next two years. About a year and a half after they met, Al-Musawwir told

---

[4] The affidavit also stated that Al-Musawwir told Holley that Al-Musawwir "was working in late 1997 or early 1998 for a temporary agency as a janitor." According to all the evidence, Al-Musawwir was working as a delivery driver.

Cutchin about a "robbery that he had committed at the Daily Press, which another guy was imprisoned for," and said "he was worried it would come back to bite him." Dennis noted in his petition that Cutchin executed the affidavit just before he died from cancer while incarcerated.

Finally, in an affidavit signed on January 25, 2012, Donald Poindexter stated that he was "housed with a man named Abdul and another man named Andre Terry" while incarcerated at Hampton Roads Regional Jail from 1998 to 1999. Abdul and Poindexter "talked about the Daily Press robbery at least ten different times," and Abdul "eventually admitted to [Poindexter] that he had in fact been responsible." Abdul told Poindexter he had planned to get coins from the Daily Press vending machines, which were kept in the night supervisor's offices. Abdul, however, was "caught in the act" by the night supervisor and "had to beat [him] with a pipe." Abdul also told Poindexter that "he had keys to get into the area to perform the robbery," that he "ditched the pipe outside," and that "his girlfriend picked him up, and that was his getaway."

3. Former Police Detective's Evidence

Dennis also submitted an affidavit dated July 21, 2014, and a declaration dated September 16, 2017, from Darryl Williams, a former detective for the Newport News Police Department who responded to the attack. Williams stated that after the case was assigned to Detective Price, "Price was subjected to incredible pressure from upper management to close the case," which caused the investigation to seem "rushed." In early 1999, a sergeant from the Hampton Police Department advised Williams that Holley, who was then an inmate at Hampton Roads Regional Jail, "had information relating to an incident that had occurred at the Newport News Daily Press." Williams interviewed Holley, who told him about Al-Musawwir's confession. Williams found Holley's account to be "sufficiently credible" to justify reopening the investigation, a decision that "was not well received by many of my fellow officers" who

13

"saw it as a betrayal." Williams continued to investigate the case until 2002, when he left the Newport News Police Department.

During his investigation, Williams interviewed "numerous parties" including Al-Musawwir's fellow inmates, Walker, Dennis, Harrison, and various Daily Press employees. Williams averred that he learned the following information during the course of his investigation:

a. Most of the employees at the Daily Press knew that Dennis and Harrison had been involved with the same woman.

b. Al-Musawwir was a Daily Press truck driver, and he worked the evening shift delivering newspapers.

c. Al-Musawwir knew that money from newspaper vending machines was kept in Lynwood Harrison's office.

d. Harrison's office was easily accessible from a break room that Daily Press truck drivers used.

e. A set of keys to all the Daily Press buildings and offices went missing sometime before the incident.

f. On the night of the incident, a security guard working in the front lobby of the Daily Press observed what appeared to be a white-colored vehicle leaving the Daily Press property at a high rate of speed.

g. Koneta Walker, Al-Musawwir's then-girlfriend, owned a white-colored vehicle.

Williams interviewed Walker twice. During the first interview in March 1999, Walker did not mention Al-Musawwir's involvement in the attack, but during the second interview at least a year later, Walker disclosed that "she had picked Al-Musawwir up from the Daily Press on the night of the attack, and that he had been sweating profusely and carrying a bag of coins." Walker explained that she was reticent during the first interview because she was "terrified of Al-Musawwir."

14

Williams also remarked on the physical similarity between Dennis and Al-Musawwir, nothing that, "[h]aving met both Dennis and Al-Musawwir during my investigation," the two are "extremely similar looking, and could be easily mistaken for each other." He elaborated: "[t]hey are of similar height and weight; they both have long oval-shaped faces, receding hair lines, and thick lips; and they are both thinly built. They also both wore similar uniforms while working at the Daily Press."

Williams additionally reviewed the photograph array Price showed Harrison and included a copy in his affidavit. He noted his "significant concerns" with the photograph array, emphasizing that Dennis' photograph "obviously stands out" because of its comparatively high quality and different-colored background. Williams also stated that notes from an interview between Price and Harrison suggest that Harrison mentioned he was not wearing his eyeglasses during the attack, which would draw further doubt on his identification of Dennis.

Acting on these suspicions, Williams developed a photograph array using "standard police procedures" that was in all respects the same as the original except that it included photographs of both Dennis and Al-Musawwir. Williams reported that when he asked Harrison to review the spread carefully, Harrison initially looked away. Once Harrison actually looked at the array, "he became flustered and frustrated, pushed it away, and simply said that he knew he picked the right person." Williams stated that "[i]t was apparent to me from [Harrison's] demeanor, however, that he felt he may have picked the wrong person." Williams concluded his affidavit by averring that, based on his investigation, "I am confident that the attack upon Lynwood Harrison was committed by Abdul Hasib Al-Musawwir, not Nathaniel Dennis."

15

E. Motion to Dismiss Petition for Actual Innocence

The Commonwealth filed a motion to dismiss Dennis's petition in the Court of Appeals, including as evidence supporting dismissal a report completed by Special Agent Allen Boyd of the Virginia State Police, who interviewed Al-Musawwir on July 14, 2017. During that interview, Al-Musawwir admitted that he had worked at the Daily Press as a delivery driver on the night of the attack, but denied any involvement in the crime. Al-Musawwir asserted that "Holley had initiated all of the allegations that he actually committed the crime at the Daily Press" because "Holley saw that Al-Musawwir looked similar to his friend Nathaniel Dennis so he accused Al-Musawwir to help his friend." Additionally, Al-Musawwir told Boyd that "Dennis was supposed to get Holley some money later on if he implicated Al-Musawwir in the crime Dennis was convicted of." To support this assertion, Al-Musawwir provided Boyd handwritten letters purportedly from Terry and Wiggins, which he kept in his cell. Both letters are dated February 15, 1999, and state that Dennis promised Holley money if Holley implicated Al-Musawwir in the Daily Press attack.[5] At the interview's conclusion, Al-Musawwir told Boyd that he would have admitted committing the crime had he actually done so because he "already ha[s] life" and "has nothing else to lose."

A three-judge panel of the Court of Appeals dismissed Dennis' petition by order on October 31, 2017. Relying on *Carpitcher v. Commonwealth*, 273 Va. 335, 345–46 (2007), the Court of Appeals explained that to "be 'material,' within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on

---

[5] In his second declaration, Williams recounted that "Al-Musawwir did not mention having any letters from Andre Wiggins or Andre Terry discrediting Holley" when he interviewed Al-Musawwir "sometime after [his] initial March 1999 interview with George Holley."

non-biological evidence must be true," not merely "contrary to the evidence presented at the[] criminal trial."

The Court of Appeals determined that Dennis "failed to establish that the allegations contained in the affidavits of Holley, Wiggins, Terry, Poindexter, and Cutchin were true" for two reasons: (1) Al-Musawwir's consistent denial of both involvement in the Daily Press attack and confessing to fellow inmates, and (2) the letters Al-Musawwir kept from Wiggins and Terry detail Holley's intention to frame Al-Musawwir for financial gain and cast doubt on the affidavits' veracity. Additionally, the Court of Appeals determined the inmates' affidavits amounted to "nothing more than evidence contrary to the evidence presented at trial" because Harrison has consistently and repeatedly identified Dennis as the perpetrator.

The Court of Appeals also rejected Walker's affidavits because they did not provide proof of Dennis' factual innocence. As an initial matter, the Court of Appeals observed that both of her affidavits purport to "describe events that occurred on October 13, 1997, which was not the night the attack occurred," and therefore "lack probative value." It went on to consider the affidavits on their merits, noting that they "did not state that Al-Musawwir confessed to the crimes," but instead "merely related some suspicious circumstances about Al-Musawwir's appearance and demeanor on a night she picked him up early from work."

The Court of Appeals ultimately held that "Dennis has not demonstrated, clearly and convincingly, that the evidence upon which he relies is material and, when considered with all the other evidence in the record, proves that no rational trier of fact would have found him guilty," and accordingly dismissed the petition. Dennis timely noted his appeal to this Court, which we granted.

17

## II. ANALYSIS

Dennis' objections to the Court of Appeals' order are best summarized in his sixth assignment of error: "The Court of Appeals abused its discretion by dismissing Dennis's petition without an evidentiary hearing." When considering the Court of Appeals' dismissal of a petition for a writ of actual innocence based on nonbiological evidence, this Court ordinarily applies a de novo standard of review to both its conclusions of law and conclusions based on mixed questions of law and fact. *Johnson v. Commonwealth*, 273 Va. 315, 321 (2007). Similarly, when the Court of Appeals refers issues to a circuit court for an evidentiary hearing and subsequently approves the circuit court's findings, those findings bind this Court unless they are plainly wrong or without evidence to support them. *Id.* Whether to refer an issue to a circuit court in the first instance, however, is a decision that lies within the Court of Appeals' "broad discretion." *Haas v. Commonwealth*, 283 Va. 284, 291 (2012). Accordingly, we review the Court of Appeals' decision not to order an evidentiary hearing for abuse of that discretion.

The General Assembly conferred original jurisdiction on the Court of Appeals to entertain petitions for writs of actual innocence based on nonbiological evidence when it enacted Code §§ 19.2-327.10 through -327.14. The Court of Appeals may grant such a writ "only upon a finding that the petitioner has proven by clear and convincing evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of § 19.2-327.11, and upon a finding that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." Code § 19.2-327.13. Thus, to obtain relief under the statutory scheme, the petitioner must allege and prove that the newly discovered evidence:

> (1)  "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction . . . became final in the circuit court;" Code § 19.2-327.11(A)(iv);

18

(2)  "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction . . . by the circuit court;" Code § 19.2-327.11(A)(vi);

(3)  "is material, and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt . . . beyond a reasonable doubt;" Code § 19.2-327.11(A) (vii); and

(4)  "is not merely cumulative, corroborative or collateral." Code § 19.2-327.11(A)(viii).

The Court of Appeals' order dismissing Dennis' petition implicated the third requirement that the evidence be material. As that Court correctly observed, "to be 'material,' within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true." *Carpitcher*, 273 Va. at 345. Determining whether evidence is true requires factual findings.

A. Appellate Deference to Trial Court Findings of Fact

Appellate courts, however, do not engage in factual evaluation. This core value of our legal system was an established principle as early as 1628, when Sir Edward Coke wrote: "ad questionem facti non respondent judices; ad questionem juris non respondent juratores." *Jones v. United States*, 526 U.S. 227, 247 n.8 (1999) (quoting 1 E. Coke, Institutes of the Laws of England 155b (1628)). America's founders recognized this division of judicial responsibilities— that juries determine questions of fact and judges questions of law—as an essential protection of popular sovereignty over the judicial branch. *See* D. Arthur Kelsey, *The Architecture of Judicial Power: Appellate Review & Stare Decisis*, Va. Law., Oct. 2004, at 13, 14–15. In fact, they saw the protection as being so vital that the Constitution's ratification was jeopardized because it provided for "appellate jurisdiction, both as to law and fact" in the Supreme Court, but no right

19

to a jury trial in civil cases. U.S. Const. art. III, § 2. As Justice Story, one of the last great contemporary commentators on the Constitution explained, appeals during the time of ratification were of civil rather than common law origin and "subject[ed] the fact, as well as the law, to a review and a retrial." Joseph Story, A Familiar Exposition of the Constitution of the United States § 379, at 225 (1840). Five states, Virginia among them, voted to ratify the Constitution only with the understanding that their proposed amendments—including a civil jury trial right and prohibition against appellate fact-finding—would be submitted to the first Congress. *See* Edward Dumbauld, The Bill of Rights and What It Means Today 76, 181–82, 183–84, 188, 190–92, 200, 204 (1957). Virginia, for instance, proposed that in cases other than those involving ambassadors, states as parties, equity, or admiralty, "the Supreme Court shall have appellate jurisdiction as to matters of law only." *Id.* at 188.

These concerns resulted in the Seventh Amendment, which guarantees civil jury trials and provides that "no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. By invoking the common law, which did not permit appellate review of facts, the Amendment mandated appellate deference to jury fact findings and ameliorated concerns that the newly established federal appellate courts could retry cases with abandon. As Justice Story observed in an early case interpreting the Amendment:

> Now, according to the rules of the common law the facts once tried by a jury are never re-examined, unless a new trial is granted in the discretion of the court, before which the suit is depending, for good cause shown; or unless the judgment of such court is reversed by a superior tribunal, on a writ of error, and a venire facias de novo is awarded. This is the invariable usage settled by the decisions of ages. Upon a writ of error, the appellate court can examine in general errors of law only, and never can re-try the issues already settled by a jury, where the judgment of the inferior court is affirmed.

20

> According to the obvious intention of the amendment, the legislature then could have no authority to give an appellate jurisdiction, the power to re-examine by a jury the former decision of another jury, while the judgment below stood unreversed. . . . It is not a little remarkable, that the most strenuous objection against the constitution originally contemplated a reverse sense of the word, viz. that the court, and not the jury, might review the facts. If this be true, then the present attempt, to claim of right a new trial in the appellate court, is a novelty, to which we are bound to answer "Nolumus leges communes mutari." [We do not wish the common law to change.]

*United States v. Wonson*, 28 F. Cas. 745, 750 (C.C.D. Mass. 1812) (Story, J.) (No. 16,750).

Virginia has enshrined this tradition of appellate deference to trial-level factual findings in a statutorily mandated standard of review since 1887, when the General Assembly enacted Code § 3484. The statute persisted through several reenactments of the Code of Virginia, and its current form, Code § 8.01-680, provides that when factual findings are challenged on appeal, "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." The reason for this highly deferential standard is that juries and trial judges are better equipped to evaluate the truth of facts than appellate judges. Unlike appellate judges, juries and trial judges are present in the courtroom to observe witnesses' demeanor and hear their testimony as they undergo rigorous cross-examination, "the greatest legal engine ever invented for the discovery of truth." 5 John Henry Wigmore, Wigmore on Evidence § 1637, at 29 (3d ed. 1940). In the case cited by the 1887 statutory revisers as the earliest precedent establishing a rule of decision for appeals involving challenged facts, this Court articulated the trial court's superior position to assess the truth to justify its deference:

> [I]t is manifest that both the courts below disbelieved [one witness], and gave full credit to [another witness]. There is nothing in this record sufficient to destroy the credit of either of these witnesses, except it be the testimony of the other. The

21

> credibility of witnesses depends on a variety of circumstances, which may be seen and known by those who are present at their *viva voce* examination, but which cannot be transmitted through their written testimony, to an appellate court. On a mere question of credibility, therefore, when there is nothing in the record to throw light on the subject, this court will always presume, that the inferiour court, that saw and heard the witnesses examined, has decided correctly.

*Dudleys v. Dudleys*, 30 Va. (3 Leigh) 436, 441 (1832). Trial-level assessments of the evidence therefore deserve substantial weight.

B. The Court of Appeals' Discretion to Determine Facts

This case presents one of the rare situations in which the General Assembly has charged an appellate court with engaging in factual evaluation. In proceedings under the statutes governing petitions for writs of actual innocence based on nonbiological evidence, the Court of Appeals acts as a court of original jurisdiction. *Haas*, 238 Va. at 292. As such, it "has the same authority to weigh and evaluate documentary and physical evidence as a trial court would have." *Id.* Although it has the same authority, as discussed above, appellate courts lack the same capacity to evaluate evidence.

Perhaps recognizing this tension, the General Assembly has provided a mechanism by which the Court of Appeals can engage a trial court's unique capabilities to assist it in resolving factual questions raised by a petition. Code § 19.2-327.12 provides, in relevant part:

> If the Court of Appeals determines from the petition, from any hearing on the petition, from a review of the records of the case, or from any response from the Attorney General that a resolution of the case requires further development of the facts, the court may order the circuit court in which the order of conviction . . . was originally entered to conduct a hearing within 90 days after the order has been issued to certify findings of fact with respect to such issues as the Court of Appeals shall direct.

22

In this statute, the General Assembly has recognized that trial courts are best equipped to serve as fact finders by authorizing the Court of Appeals to refer the case to a circuit court for "further development of the facts." But this procedure is not mandatory. The first word of the statute—"if"—signals its conditional nature: the Court of Appeals has the authority to order an evidentiary hearing "if, in its discretion, it deems that the facts require further development." *Haas*, 283 Va. at 291. The Court of Appeals is not required to do so. This is because, in Code § 19.2-327.13, the General Assembly also gave "the Court of Appeals clear authority to decide such a petition on the basis of matters contained in the record." *Haas*, 283 Va. at 291. Accordingly, it is up to the Court of Appeals to exercise its broad discretion in reviewing the record to determine whether the facts require further development.

This case calls upon us to decide whether the Court of Appeals abused its discretion by determining that the facts in this case did not require further development in a circuit court evidentiary hearing. Although the Court of Appeals' discretion in this context is considerable, the Court nevertheless "abuses its discretion if it inaccurately ascertains [the] outermost limits" of the available range of choice. *Lawlor v. Commonwealth*, 285 Va. 187, 213 (2013). To define the contours of that range, we turn to other cases in which the Court of Appeals exercised its discretion to order a hearing.

The recently decided case of *Bush v. Commonwealth*, 68 Va. App. 797 (2018), illustrates when the nature of the newly discovered evidence itself renders an evidentiary hearing unnecessary. In that case, the petitioner had been convicted of two bank robberies committed by a single actor. *Id.* at 800–02. The evidence supporting the petition consisted of unprompted confessions to both robberies by a hitherto unknown party, one of which had resulted in a guilty plea at the time of filing. *Id.* at 800. The confessor, who was unaware that someone had already

been convicted for the robberies, accurately described the crimes in great detail and provided a handwriting sample that matched the note used in one of the robberies. *Id.* at 802–03. The Court of Appeals determined that the record did not require further development and granted the petition based only on the written record. *Id.* at 804–11. In assessing materiality, the Court held that "the nature of this evidence itself—another person's confession to the crimes—supports the finding that this evidence is 'true,' and thus material." *Id.* at 806.

The majority of precedential cases discussing the Court of Appeals' discretion to order an evidentiary hearing involve recantation evidence, which is more difficult to assess from a cold record than the sort of evidence in *Bush*. The materiality inquiry is particularly important when a petition for a writ of actual innocence is based largely on a recantation because, "[u]nless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness herself." *Carpitcher*, 273 Va. at 346. In three of the four actual innocence cases this Court has considered involving recantation evidence, the Court of Appeals exercised its discretion to refer the case for an evidentiary hearing on issues of witness credibility, then relied on the circuit court's factual findings to dismiss the petition. *Turner v. Commonwealth*, 282 Va. 227, 240–41 (2011); *Carpitcher*, 273 Va. at 341; *Johnson*, 273 Va. at 319–20.

In the fourth case, *Haas v. Commonwealth*, the Court of Appeals declined to order an evidentiary hearing. 283 Va. at 289. On appeal to this Court, the petitioner's sole assignment of error was that the Court of Appeals abused its discretion by making evidentiary findings and dismissing the petition without a circuit court evidentiary hearing regarding the new evidence. *Id.* at 288. The newly discovered evidence in *Haas* consisted of recantation affidavits from three witnesses who testified at the original trial and medical affidavits contradicting expert medical

24

testimony offered at the original trial. *Id.* at 289. Emphasizing the Court of Appeals' "broad discretion in determining whether the facts require further development," we observed:

> Where a new witness has been found, who has not previously testified and who could not with due diligence have been discovered before the conviction became final, reference to the circuit court for an evidentiary hearing might be appropriate because of a trial judge's unique ability to see and hear the witness first hand and to evaluate his credibility from his appearance and demeanor while testifying. Witnesses who testified at the original trial, but later decide to recant their testimony, stand on a different footing.

*Id.* at 291–92. This observation suggests—albeit in dicta—that although truly new evidence, such as a previously undiscovered witness, would likely merit an evidentiary hearing, the recantation affidavits offered in *Haas* were not really new. *Id.* at 292. Having thus indicated that the recantation evidence was suspect, and further determined that the medical affidavits were "merely cumulative" of evidence rejected at trial, this Court held that the Court of Appeals did not abuse its discretion by declining to order an evidentiary hearing. *Id.* at 294–95.

The dicta in *Haas* anticipated a case like this one. Unlike the unprompted confession in *Bush* and recantations from trial witnesses decades after the fact in *Haas*, in this case, "new witness[es] ha[ve] been found, who ha[ve] not previously testified and who could not with due diligence have been discovered before the conviction became final." *Haas*, 283 Va. at 292. Al-Musawwir, Walker, and the inmates were all essentially unknown at the time of Dennis' trial, and, with the information available at the time, could not have been discovered before Dennis was convicted. The accounts of the inmates and Walker, if credited, would tend to exonerate Dennis and implicate Al-Musawwir. But Al-Musawwir's denials and the letters from Terry and Wiggins, if credited, would tend to confirm Dennis' conviction. This situation is analogous to that facing this Court in its earliest case discussing deference to trial court factual findings:

25

"There is nothing in this record sufficient to destroy the credit of either of these [sets of] witnesses, except it be the testimony of the other." *Dudleys*, 30 Va. (3 Leigh) at 441. In contrast to the Court in *Dudleys*, however, the Court of Appeals in this case did not have the benefit of a circuit court's "unique ability to see and hear the witness[es] first hand and to evaluate [their] credibility from [their] appearance and demeanor while testifying." *Haas*, 283 Va. at 292. It therefore could not see whether it was "manifest that . . . the court[] below disbelieved [one set of witnesses], and gave full credit to [another]." *Dudleys*, 30 Va. (3 Leigh) at 441.

In heavily fact-dependent cases, like this one, that turn on the materiality of new evidence offered by new witnesses whose credibility is not apparent from the record, the Court of Appeals should err on the side of ordering a circuit court evidentiary hearing. Trial courts, not appellate courts, are equipped to perform the credibility assessments essential to finding the truth. The Court of Appeals determined that Dennis had not met his burden of proving the truth of the previously untested affidavits, but nevertheless credited the equally untested and unauthenticated letters from Terry and Wiggins as well as Al-Musawwir's denials. Absent an evidentiary hearing, it had no basis to do so. Accordingly, the Court of Appeals "inaccurately ascertained [the] outermost limits" of its discretion to determine whether to order a hearing. *Lawlor*, 285 Va. at 213. It abused its discretion by dismissing Dennis' petition because he failed to establish that the affidavits were true without providing him the opportunity to do so in a circuit court evidentiary hearing.

We take no position on the merits of Dennis' petition. He ultimately must prove by clear and convincing evidence not only that the evidence in support of his petition is material, but also that "when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." Code

§§ 19.2-327.11(A)(vii); 19.2-327.13.  In determining whether Dennis has met this burden, the reviewing court will "look beyond whether the evidence is sufficient to sustain the conviction; [it] must also examine the likelihood of a reasonable juror finding the petitioner guilty beyond a reasonable doubt once all of the evidence has been fairly considered." *In re Watford*, 295 Va. 114, 124 (2018) (footnote omitted).  This is a heavy burden.  Even under the probabilistic approach adopted by the General Assembly's 2013 amendments to the actual innocence statutes, "a petitioner's evidence must do more than establish the theoretical possibility that a rational fact finder would choose to acquit; it must establish such a high probability of acquittal, that [the reviewing court] is reasonably certain that no rational fact finder would have found him guilty." *Id.*  Notwithstanding the difficulty of Dennis' ultimate task, justice favors providing a full opportunity for factual development before the reviewing court decides his petition.  A circuit court evidentiary hearing will provide him a chance to meet that burden.

### III.  CONCLUSION

Dennis offered several previously unknown and untested witness affidavits in support of his petition for a writ of actual innocence based on nonbiological evidence, which the Commonwealth countered with previously unknown and untested witness statements of its own. The probative value of each witness's testimony hinged on his or her credibility.  Despite the statutory mechanism for referring issues in actual innocence cases to a circuit court for factual determination, the Court of Appeals determined from the record alone that the evidence supporting Dennis' petition was not material and accordingly denied the petition.  Although the Court of Appeals has broad discretion to determine whether the facts require further development, under the facts in this case, the refusal to order a hearing constituted an abuse of discretion.  Accordingly, we reverse the Court of Appeals' judgment dismissing Dennis' petition

27

and remand for purposes of ordering a circuit court evidentiary hearing consistent with this opinion.

*Reversed and remanded.*